Filed 12/18/19 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| UNITED ARTISTS THEATRE CIRCUIT, INC.,<br><br>    Plaintiff and Appellant<br><br>v.<br><br>CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO REGION,<br><br>    Defendant and Appellant;<br><br>MOONLITE ASSOCIATES LLC,<br><br>    Real Party in Interest. | A152988<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]**<br><br>(Alameda County<br>Super. Ct. No. RG16811955) |

**BY THE COURT:**

It is ordered that the opinion filed November 27, 2019 be modified as follows:

(1) On page 2, replace the first sentence on the first complete paragraph with the following:

As to the knowledge component of "permitted," we adopt a standard that focuses on the landlord's awareness of a risk of discharge: a prior owner may be named in a section 13304 cleanup order upon a showing the owner knew or should have known that a lessee's activity created a reasonable possibility of a discharge into waters of the state of wastes that could create or threaten to create a condition of pollution or nuisance.

1

(2)     On page 2, replace footnote 2 with the following:

Section 13050, subdivision (d), broadly defines "waste" to include "sewage and any and all other waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation. . . ."

(3)     On page 2, replace the first sentence and citation in the "Statutory Background" section with the following:

In 1967, the Legislature created the State Water Resources Control Board (State Board) within the Resources Agency; the State Board now resides within the California Environmental Protection Agency. (§ 175; Stats. 1967, ch. 284, § 2.4, p. 1442, eff. Dec. 1, 1967; Governor's Reorganization Plan No. 1 of 1991, § 192, eff. July 17, 1991, 4 Stats.1991; see also Gov't Code, § 12080 et seq.)

(4)     On page 11, at the end of the first sentence of the first complete paragraph, replace the words "of hazardous waste" with the "into waters of the state of wastes that could create or threaten to create a condition of pollution or nuisance" so the sentence reads:

Rather than the standard adopted by the trial court or that proposed by the Regional Board, we conclude a prior owner may be named in a cleanup order as someone who has "permitted" a discharge if it knew or should have known that a lessee's activity presented a reasonable possibility of discharge into waters of the state of wastes that could create or threaten to create a condition of pollution or nuisance.

(5)     On page 18, delete the word "hazardous" from the sentence "In 1980, the Legislature enacted Assembly Bill 2700 (AB 2700), which amended provisions of the Health and Safety Code and the Water Code to expand the authority of the State Director of Health Services and of regional water quality control boards to address hazardous waste control and cleanup."

(6)     On page 20, delete the word "hazardous" from the sentence "However, a true strict liability statute would impose liability on an owner whose lessee discharged hazardous waste into the state's water supply whether or not the owner knew of the tenant's activities."

(7)     On page 20, footnote 17, delete the word "hazardous" from the sentence "In the present case, UATC does not claim it took any steps to prevent discharges of hazardous wastes from the dry-cleaning operation, so we have no occasion to consider whether any such showing could provide a basis to avoid being named in a cleanup order."

(8)     On page 22, replace footnote 18 with the following:

> The Regional Board refers to statements in a Department of Justice memorandum and a Department of Fish and Game bill analysis that support their contention that section 13304, as amended by AB 2700, imposes strict liability. It unclear whether it is appropriate for this court to consider those analyses, absent any indication they were available to the full Legislature. (See *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062; *Hutnick*, *supra*, 47 Cal.3d at p. 465, fn. 7; but see *Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 [approving consideration of enrolled bill reports].) In any event, even if it is appropriate to consider them, they do not address the meaning of the word "permitted" in section 13304.

(9)     On page 29, at the end of the first sentence of the first complete paragraph, replace the words "hazardous wastes" with "wastes that could create or threaten to create a condition of pollution or nuisance" so the sentence reads:

> Contrary to the Regional Board's contention that the term "permitted" in section 13304 imposes only the limited burden of showing an owner was aware of the general activity that resulted in a discharge, *Laube* supports the position that before an owner can be said to have "permitted" harm resulting from a lessee's conduct, there must be some basis to conclude that the owner was aware or should

3

have been aware of the reasonable possibility that harm would occur—in this case the discharge of wastes that could create or threaten to create a condition of pollution or nuisance.

(10)    On page 29, footnote 20, delete the word "hazardous" from the sentence "The section 13304 context differs and supports a construction of 'permitted' that permits a Regional Board to name an owner in a cleanup order where, in the language of *Laube*, the owner had 'the obligation to be diligent' because it knew or should have known that a lessee's activity made the discharge of hazardous wastes 'reasonably possible.' "

(11)    On page 30, delete the word "hazardous" from the sentence "To the contrary, the public has a strong interest in preventing the discharge of hazardous wastes and would benefit from greater vigilance on the part of property owners."

(12)    On page 31, in the first paragraph replace the sentence "The public has a strong interest in the cleanup of hazardous wastes and relieving owners of liability shifts the costs to others or, if there are no solvent other responsible parties, to the public." with the following:

> The public has a strong interest in waste cleanup and relieving owners of liability shifts the costs to others or, if there are no solvent other responsible parties, to the public.

(13)    On page 37, delete the word "hazardous" from the sentence "Thus, *Stuart* can be read to require a showing that a prior owner or lessor knew or should have known about the risk of hazardous waste discharge."

(14)    On page 39, replace the first sentence of the first complete paragraph with the following:

> We construe "permitted" in section 13304 to mean that a prior owner may be named in a cleanup order if it knew or should have known that a lessee's activity created a reasonable possibility of discharge into waters of the state of wastes that could create or threaten to create a condition of pollution or nuisance.

(15)     On page 39, at the end of the first sentence of the second paragraph in the "Conclusion" section, replace the words "hazardous wastes" with "wastes that could create or threaten to create a condition of pollution or nuisance" so the sentence reads:

> The Regional Board's interpretation comes close to writing "permitted" out of the statute by imposing liability under a cleanup order absent any knowledge, actual or constructive, that a lessee's activity created a risk of discharge of wastes that could create or threaten to create a condition of pollution or nuisance.

(16)     On page 40, delete the word "hazardous" from the sentence "Construing section 13304 to authorize regional boards to name such owners in cleanup orders elevates their interest in mitigating the risk of discharges of hazardous wastes by lessees—and landowners are in a position to prevent such discharges."

(17)     On page 40, in the last sentence of footnote 28, replace the word "hazardous" with the word "waste" so the sentence reads:

> It is more consistent with the Legislature's goal of environmental protection to encourage caution by and impose responsibility on landowners who should know waste discharges are reasonably *possible*.

(18)      On page 42, footnote 30, delete the word "hazardous" from the sentence "Arguably, under *Ohio v. Kovacs* (1985) 469 U.S. 274 and its progeny, the Regional Board's Cleanup Order is a claim because it directs an entity no longer in possession of the subject property to clean-up hazardous waste deposited before the bankruptcy confirmation date."

(19)     On page 47, in the final paragraph on the page, replace the words "hazardous waste discharges" with the "discharges of wastes that could create or threaten to create a condition of pollution or nuisance" so the sentence reads:

> The parties are not similarly situated: while it is reasonable to hold a landowner responsible for what it permits to take place on its property, it is not reasonable to expect the regional boards to track bankruptcy proceedings involving all

landowners who have leased to dry cleaners (and every other business that might present a risk of discharges of wastes that could create or threaten to create a condition of pollution or nuisance).

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Dated: _____                    _____, P.J.

Filed 11/27/19 (unmodified version)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| UNITED ARTISTS THEATRE CIRCUIT, INC., | |
|     Plaintiff and Appellant, | |
| v. | A152988 |
| CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO REGION, | (Alameda County Super. Ct. No. RG16811955) |
|     Defendant and Appellant; | |
| MOONLITE ASSOCIATES LLC, | |
|     Real Party in Interest. | |


Under Water Code section 13304,[1] a prior owner of property may be required to participate in the cleanup of wastes discharged from its property that resulted in ground water contamination, if that person "caused or permitted" the discharge. The San Francisco Bay Regional Water Quality Control Board (Regional Board) named United Artists Theatre Circuit, Inc. (UATC) in a section 13304 cleanup order addressing waste discharges from dry cleaning operations at a shopping center owned by UATC in the 1960s and 1970s. UATC filed a petition challenging its inclusion in the order, and the trial court concluded the Regional Board had erred.

On appeal, both the Regional Board and UATC agree that the word "permitted" contains a knowledge component, but they disagree on the degree of knowledge required

---

[1] All undesignated statutory references are to the Water Code.

1

to establish a prior owner's liability for a cleanup resulting from a tenant's activities. Furthermore, UATC argues that even if it would otherwise be subject to a cleanup order, its liability was discharged in a bankruptcy reorganization proceeding commenced in the year 2000. Each of these matters are issues of first impression in California.

As to the knowledge component of "permitted," we adopt a standard that focuses on the landlord's awareness of a risk of discharge: a prior owner may be named in a section 13304 cleanup order upon a showing the owner knew or should have known that a lessee's activity created a reasonable possibility of a discharge of wastes into waters of the state that could create or threaten to create a condition of pollution or nuisance (hereafter "hazardous wastes").[2] This test is informed by the Legislature's express intent to "exercise its full power and jurisdiction to protect the quality of waters in the state." (§ 13000.) We further conclude that, even assuming the Regional Board's entitlement to a cleanup order was a claim within the meaning of bankruptcy law, it was not discharged in UATC's bankruptcy proceeding because it did not arise before confirmation of reorganization.

BACKGROUND

*Statutory Background*

In 1967, the Legislature created the State Water Resources Control Board (State Board) within what was then the Resources Agency and is now the California Environmental Protection Agency. (§ 175; Stats. 1967, ch. 284, § 2.4, p. 1442, eff. Dec. 1, 1967.) In 1968, the Assembly Committee on Water suggested that the State Board

---

[2] Because section 13304 uses the term "waste," the waste discharged need not qualify as a "hazardous substance" as defined in section 13050 in order to be the subject of a section 13304 cleanup order. Section 13050, subdivision (d), broadly defines "waste" to include "sewage and any and all other waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation. . . ." Wastes are "hazardous" as used in this decision for the purpose of section 13304 where an owner knows or should know that the wastes can create or threaten to create a condition of pollution or nuisance if discharged into waters of the state.

2

"establish a task force to develop a comprehensive review of the Water Quality Control Act . . . ."  (Assem. Daily J. (May 13, 1968) pp. 3003–3005.)  The State Board responded by convening a Study Panel that produced in March 1969 a report entitled "Recommended Changes in Water Quality Control[:] Final Report of the Study Panel to the California State Water Resources Control Board" (Study Panel Report).[3]  The report explained that the Study Panel was composed of leaders in relevant fields and representatives of statewide organizations and state agencies "with responsibility or interest in water quality or water quality control."  (Study Panel Report, at pp. iv–v.)

The Study Panel Report contained an "Appendix A" consisting of "recommended changes" to several California codes, including the Water Code.  (Study Panel Report, March 1969, Appendix A.)  Appendix A also included various explanatory notes with respect to particular proposed provisions.  In 1969, the Legislature adopted the Study Panel's recommendations in Assembly Bill 413 (1969 Reg Sess.).  (See Stats. 1969, ch. 482, pp. 1045–1088.)[4]  The changes included replacing Division 7 of the Water Code with a new Division 7, to be known as the Porter–Cologne Water Quality Control Act (Porter–Cologne Act).  (Stats. 1969, ch. 482, §§ 17–18, pp. 1051–1052, see § 13020.)  An entry in the Assembly Journal makes clear the Legislature's reliance on the work of the Study Panel.  In particular, the Assembly Committee on Water reported that, "Except for the comments set out below, the notes contained under the various sections of Assembly Bill No. 413 as set out in corresponding sections in *Appendix A* [of the Study Panel Report] reflect the intent of the Assembly Committee on Water in approving the various

---

[3] We take judicial notice of the Study Panel Report.  (Evid. Code, §§ 452, subd. (c), 459; see also *People ex rel. Cal. Regional Wat. Quality Control Bd. v. Barry* (1987) 194 Cal.App.3d 158, 174, fn. 12 (*Barry*) [taking judicial notice of same report].)

[4] Section 36 of the enactment states, "This act is intended to implement the legislative recommendations of the final report of the State Water Resources Control Board submitted to the 1969 Regular Session of the Legislature entitled 'Recommended Changes in Water Quality Control,' prepared by the Study Project-Water Quality Control Program."  (Stats. 1969, ch. 482, p. 1088, § 36; see also *Barry*, *supra*, 194 Cal.App.3d at pp. 173–174.)

provisions of Assembly Bill No. 413." (Assembly Journal, May 5, 1969, pp. 2677–2678.)

The Porter–Cologne Act finds and declares "that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and that the quality of all the waters of the state shall be protected for use and enjoyment by the people of the state." (§ 13000.) The Act further declares "that activities and factors which may affect the quality of the waters of the state shall be regulated to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (*Ibid.*) Moreover, the Act declares "that the health, safety and welfare of the people of the state requires that there be a statewide program for the control of the quality of all the waters of the state; that the state must be prepared to exercise its full power and jurisdiction to protect the quality of waters in the state from degradation originating inside or outside the boundaries of the state . . . and that the statewide program for water quality control can be most effectively administered regionally, within a framework of statewide coordination and policy." (*Ibid.*; see also *City of Burbank v. State Water Res. Control Bd.* (2005) 35 Cal.4th 613, 619 (*Burbank*); *San Diego Gas & Electric Co. v. San Diego Regional Water Quality Control Bd.* (2019) 36 Cal.App.5th 427, 434–435 (*San Diego Gas & Electric*); *Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 875 (*Bldg. Indus. Assn. of San Diego*).)

The Porter–Cologne Act directs the State Board to "formulate and adopt state policy for water quality control" and identifies and describes nine regional water quality control boards. (§§ 13140, 13200, 13201.) "[T]ogether the State Board and the regional boards comprise 'the principal state agencies with primary responsibility for the coordination and control of water quality.' (§ 13001.)" (*Burbank*, *supra*, 35 Cal.4th at p. 619.) Among the various powers of the regional boards is the power to issue a waste

4

"cleanup and abatement order." (§ 13304.) Section 13304, subdivision (a) currently[5] provides in part, "A person who has discharged or discharges waste into the waters of this state in violation of any waste discharge requirement or other order or prohibition issued by a regional board or the state board, or who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action, including, but not limited to, overseeing cleanup and abatement efforts." A "regional board may expend available moneys to perform any cleanup, abatement, or remedial work . . . that, in its judgment, is required by the magnitude of the endeavor or the urgency for prompt action to prevent substantial pollution, nuisance, or injury to any waters of the state." (§ 13304, subd. (b)(1).) In that event, "the person or persons who discharged the waste, discharges the waste, or threatened to cause or permit the discharge of the waste . . . are liable to that governmental agency to the extent of the reasonable costs actually incurred in cleaning up the waste, abating the effects of the waste, supervising cleanup or abatement activities, or taking other remedial action." (§ 13304, subd. (c)(1).)

The Porter–Cologne Act authorizes persons aggrieved by actions of a regional board to "petition the state board to review such action." (§ 13320, subd. (a); see also *Barry*, *supra*, 194 Cal.App.3d at p. 171.) The State Board's decision may be reviewed in the superior court by way of a petition for writ of mandate. (§ 13330.)

*The Shopping Center and Dry Cleaner*

The Moonlite Shopping Center (the Center) is located on El Camino Real in Santa Clara, California. The Center has several large tenant spaces and twenty-five smaller tenant spaces. Saratoga Creek is located to the east of the Center.

---

[5] The relevant changes between the current version of section 13304 and the statute as enacted in 1969 are addressed later in this decision.

5

UATC (then United California Theaters, Inc.) began construction of the Center in 1960 and it opened in 1962. UATC owned the Center until 1975, and was the master lessor until 1978. Real party in interest Moonlite Associates, LLC (Moonlite) has owned the Center since 1977.

For 35 years, from 1962 until 1997, a drycleaner (Moonlite Cleaners) continuously operated at the Center, under a number of different owners. The dry cleaner used "transfer" machines that used perchlorethylene (aka "tetrachloroethylene" and "PCE") as the cleaning solvent. The machines, which were effectively banned in 1998, required the manual transfer of clothes soaked with PCE from the washer to the dryer.

*PCE*

In *City of Modesto v. Dow Chemical Co.* (2018) 19 Cal.App.5th 130 (*Modesto II*),[6] Division Four of this District described PCE as follows: "PCE, also known as tetrachloroethylene, is a molecule containing chlorine atoms and carbon atoms. It is also characterized as a 'volatile halogenated organic compound,' a 'halogenated hydrocarbon', a 'chlorinated solvent' or a 'chlorinated hydrocarbon.' As shorthand, it is referred to as 'perc' or PCE. All chlorinated hydrocarbons, like all solvents other than water, are 'toxic.' In 1978, the National Institute for Occupational Safety Hazards (NIOSH) recommended that PCE be handled as if it were a human carcinogen. In 1980 the State of California began regulating PCE as a hazardous waste. In 1984, when the

---

[6] *Modesto II* was preceded by the decision in *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 (*Modesto I*). (See *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th at pp. 440–441.) In the *Modesto* cases, the City of Modesto and its sewer district and redevelopment agency sued various dry cleaning businesses, manufacturers of dry cleaning equipment, and manufacturers and distributors of dry cleaning solvent. (*Modesto II*, *supra*, 19 Cal.App.5th at p. 135.) The plaintiffs "alleged that defendants had caused the City's groundwater, sewer system and easements, and the soil . . . to become contaminated with [PCE]. . . . Plaintiffs sought recovery for the past, present and future costs of investigation and remediation of the contamination at numerous sites under multiple legal theories." (*Ibid.*) The quotations from *Modesto II* are for background purposes and are not material to the issues on appeal. The administrative record below contains similar information about PCE, and the parties do not claim there are any misstatements in the *Modesto II* decision.

6

Resource Conservation Recovery Administration (RCRA) was reauthorized, its regulations brought 'small dry cleaners' under the same requirements as major hazardous waste sources, with respect to PCE." (*Modesto II*, at p. 137.)

"PCE is a colorless liquid, and is therefore difficult to see once released into soil. [¶] . . . PCE is particularly 'persistent' and 'long lived' compared to other contaminants, making it extremely difficult to accomplish complete remediation." (*Modesto II*, *supra*, 19 Cal.App.5th at p. 137.)

The record indicates that the dangers of dry-cleaning solvents in general, and PCE in particular, became gradually known during and after UATC's ownership of the Center. For example, in 1953, the Supreme Court made reference to a statute addressing "Dry Cleaning Equipment Employing Volatile and Inflammable Solvents." (*State Bd. of Dry Cleaners v. Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436, 440.) A 1961 State Fire Marshal permit required the dry cleaner at the Center to take certain precautions against vapors from unidentified dry-cleaning solvents. In 1965 the Legislature set a specific maximum level for PCE vapor in former Health and Safety Code section 13399.5, above which would be considered a " 'dangerous toxic concentration.' " (Stats. 1965, ch. 1781, § 13, p. 3974.) In 1975, the City of Santa Clara adopted an ordinance prohibiting the discharge of a variety of pollutants into the sewer system, including chlorinated hydrocarbons like PCE. In 1977, the Director of the National Institutes of Health published in the Federal Register a summary of a study regarding the "possible carcinogenicity" of PCE. (Report on Bioassay of Tetrachloroethylene for Possible Carcinogenicity, 42 Fed.Reg. 55270–55271 (Oct. 3, 1977).) In early 1978, the Environmental Protection Agency (EPA) published a list of toxic pollutants, including PCE. (Publication of Toxic Pollutant List, 43 Fed.Reg. 4108–4109 (Jan. 25, 1978).) In 1980, the EPA recognized PCE as a potential human carcinogen and adopted water quality standards for PCE. (Water Quality Criteria Documents, 45 Fed.Reg. 79318, 79340 (Nov. 28, 1980).) Other state and federal legislative and regulatory developments followed.

It is also notable that the 1969 Study Panel Report that resulted in the enactment of the Porter–Cologne Act recognized the danger of chlorinated hydrocarbons. (Study Panel Report, at p. 41.) Specifically with reference to pesticides, the Report observed, "Extensive studies of the use of pesticides, and particularly of the chlorinated hydrocarbons, have shown alarming residual concentrations in fish and fowl across wide areas of the earth, as well as here in California. Present accumulations of these toxic, nondegradable chemicals are causing heavy mortality to some birds and perhaps in fish. These concentrations do not seem to be dangerous to people in the amounts now found in California, but there is legitimate concern for the future." (*Ibid.*)

*Underlying Proceedings*

In 2004, Moonlite discovered PCE contamination in groundwater at the Center, and, in 2009, Moonlite reported the contamination to the Regional Board. Subsequent testing disclosed high PCE concentrations in soil gas, indoor air, and groundwater. Regional Board staff commented that the levels "are very significant and warrant aggressive oversight" and that the indoor air concentrations are "one of the worst we have seen."

In June 2013, the Regional Board issued a tentative cleanup and abatement order naming both Moonlite and UATC. UATC had objected to being named in the order. In September, following a hearing, the Regional Board issued a section 13304 cleanup and abatement order (the Cleanup Order) finding, "UATC is named as a discharger because it owned the Site during the time of the PCE discharges, had knowledge of the activities that caused the discharge, and had the legal ability to prevent the discharge."

In February 2016, UATC filed a petition for writ of mandate (Petition) in Santa Clara County Superior Court, naming the Regional Board, the State Board, Moonlite, and the City of Santa Clara.[7] The case was moved to Alameda County and the parties agreed

---

[7] The Petition stated that UATC had petitioned the State Board for relief from the Cleanup Order in October 2013. The Petition further stated that the State Board did not act on UATC's petition and asserted it was "deemed dismissed by operation of law."

8

to dismiss the State Board from the case. The Petition alleged four claims. First, UATC alleged it should not have been named as a discharger for several reasons, including because the evidence did not show that the contamination occurred while UATC owned or leased the Center, that UATC had actual or constructive knowledge of any discharge, or that UATC had legal authority to prevent a discharge. Second, UATC alleged the Regional Board's claim was discharged in a Chapter 11 bankruptcy proceeding initiated by UATC in 2000.[8] Third, UATC alleged the Regional Board should have named the City of Santa Clara as a discharger. And, fourth, UATC alleged it did not receive a fair hearing.

The trial court sustained the demurrer of the City of Santa Clara to the third cause of action on the grounds that the Regional Board exercised discretion in deciding whom to name in the Cleanup Order and that UATC could bring an action against the city for contribution or indemnification. On September 29, 2017, after briefing on UATC's remaining claims, the trial court entered an order granting the Petition. The court rejected the Regional Board's definition of "permitted" under which a former landlord who knew or should have known of the nature of the tenant's activities may be named in a cleanup order. The court concluded that, under section 13304, a discharger "must have had contemporaneous actual or constructive knowledge of either a specific discharge or of a dangerous condition that poses a reasonable suggestion of a discharge at the site." The trial court also concluded that the Regional Board's cleanup order was not a claim that could be discharged in UATC's bankruptcy. On October 25, the court entered judgement

---

[8] The bankruptcy court order confirming UATC's reorganization provided: "[T]he Plan shall bind all Holders of Claims and Equity Interests, and all Claims against, and Equity Interests in, the Debtors and Debtors in Possession shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely . . . and (iii) all Persons and Entities shall be precluded from asserting against the Debtors, the Debtors in Possession, the Estates, and the Reorganized Debtors, their successors and assigns, their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date." The Petition alleged the effective date was March 2, 2001.

9

pursuant to the September order, directing the Regional Board to vacate the Cleanup Order and authorizing further proceedings consistent with the September order construing section 13304.[9]

The Regional Board filed an appeal and UATC filed a cross-appeal.

DISCUSSION

I.    *The Trial Court Erred in Interpreting Section 13304*

The trial court's grant of UATC's Petition was based on its interpretation of section 13304, subdivision (a)—in particular, whether UATC could be treated as a person who "permitted" the PCE discharges at the Center.  The trial court concluded such a finding would require evidence that UATC had "actual or constructive knowledge of either a specific discharge or of a dangerous condition that poses a reasonable suggestion of a discharge at the site."  We understand the trial court's phrase "a dangerous condition that poses a reasonable suggestion of a discharge at the site" to mean a *specific* condition at a site that creates a risk of discharge, as contrasted to a risk of discharge *generally* associated with an activity.  (See Part I.B., *post*.)  As explained below, although the trial court properly construed the word "permitted" to require a showing of some knowledge on the part of UATC beyond a simple awareness that its lessee was a dry cleaner, the trial court erred in requiring knowledge or constructive knowledge of a specific discharge or specific dangerous condition.  Among other things, the principal case relied upon by the trial court, *Laube v. Stroh* (1992) 2 Cal.App.4th 364 (*Laube*), involved a very different context with constitutional and policy considerations not present here.

On the other hand, we also reject the Regional Board's interpretation of section 13304.  The Regional Board's position is that, in order to be responsible for "permitting"

---

[9] The Regional Board lists a number of other issues that it asserts were raised below but not addressed by the trial court, including "(1) whether UATC had an adequate remedy precluding writ review; (2) whether the Regional Board had sufficient evidence to conclude that discharges of PCE occurred at the site when UATC owned or leased it; (3) whether UATC had the legal authority to prevent discharges; (4) whether UATC had a fair hearing; and (5) whether the record should be augmented as requested by UATC."

a discharge, a prior owner need only have knowledge of the general activity of the tenant that resulted in the discharge. That is, unless a tenant deceives an owner regarding its activities, if an owner leases to a tenant and a discharge occurs, the owner may be named in a cleanup order, regardless of what the owner knew or should have known about the possibility of discharges and the effects on water quality that might result from any discharges. In the present case, the Regional Board argues it properly found UATC permitted the discharges at the Center because it "developed property specifically to be used as a dry cleaner business, and knowingly leased that property for more than two decades to operators that caused those discharges." Elsewhere, the Regional Board states flatly that UATC was properly named in the Cleanup Order because it "leased property to a dry cleaner whose operations resulted in a discharge."

Rather than the standard adopted by the trial court or that proposed by the Regional Board, we conclude a prior owner may be named in a cleanup order as someone who has "permitted" a discharge if it knew or should have known that a lessee's activity presented a reasonable possibility of discharge of hazardous wastes. This standard gives meaning to the word "permitted" without requiring that a regional board show a degree of awareness of risk inconsistent with the Legislature's purpose that the state "exercise its full power and jurisdiction to protect the quality of waters in the state." (§ 13000.)[10]

A. *Standard of Review*

"A party aggrieved by a final decision of the [State Board] may obtain review of the decision by filing a timely petition for writ of mandate in the superior court." (*Bldg. Indus. Assn. of San Diego*, *supra*, 124 Cal.App.4th at p. 879, citing § 13330, subd. (a).) In the present case, the review is of the Regional Board's decision because the State Board did not act on UATC's petition seeking State Board review.

---

[10] Section 13304, subdivision (a), encompasses past, present, and future discharges, and thus refers to a person who "has caused or permitted, causes or permits, or threatens to cause or permit" discharges. Because the present case involves past discharges, the relevant term is "permitted," but we see no basis to conclude that "permits" or "permit" have a different meaning with respect to the knowledge requirement.

11

Under Code of Civil Procedure section 1094.5, "an abuse of discretion" is established if the Regional Board did not proceed "in the manner required by law" in adopting the Cleanup Order, or if the Cleanup Order "is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc. § 1094.5, subd. (b); see also § 13330, subd. (e); *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 810 (*Fukuda*).) The trial court exercises its "independent judgment" in determining whether the Regional Board's findings are supported by the evidence. (§ 13330, subd. (e); Code Civ. Proc. § 1094.5, subd. (c).) Nevertheless, the trial court "must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda*, at p. 817.) "On appeal, this court ordinarily reviews the record to determine whether the trial court's findings are supported by substantial evidence. [Citation.] But where, as here, the determinative question is one of statutory or regulatory interpretation, an issue of law, we may exercise our independent judgment." (*Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1233; see also *Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 190 ["we review [the trial court's] factual determinations under the substantial evidence standard and its legal determinations under the de novo standard"].)

The statutory interpretation principles are well-established. "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities,*

12

*Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737; accord *Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.)  " '[T]he objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in . . . interpretation, and where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted . . . .' " (*People ex rel. San Francisco Bay Conservation & Development Com. v. Emeryville* (1968) 69 Cal.2d 533, 543–544; accord *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th at p. 434.)

Moreover, "[w]here the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court.  Depending on the context, it may be helpful, enlightening, even convincing.  It may sometimes be of little worth.  [Citation.]  Considered alone and apart from the context and circumstances that produce them, agency interpretations are not binding or necessarily even authoritative. . . .  'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the determination of the agency *appropriate* to the circumstances of the agency action.' " (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8.)  "Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts.  But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues.  It is this 'expertise,' expressed as an interpretation (whether in a regulation or less formally . . .), that is the source of the presumptive value of the agency's views." (*Id.* at p. 11.)

Because the Porter–Cologne Act is a law " 'providing for the conservation of natural resources,' " it is " 'of great remedial and public importance and thus should be construed liberally' [citation] so as to promote the general object sought to be accomplished." (*Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1202 (*Coastside Fishing Club*); see also § 13000 [finding and declaring "that the people of the state have a primary interest in the conservation, control,

13

and utilization of the water resources of the state"]; *Southern California Gas Co. v. Southern Coast Air Quality Management Dist.* (2011) 200 Cal.App.4th 251, 268 ["Civil statutes enacted to protect the public are generally broadly or liberally applied in favor of that protective purpose."]; *U.S. v. HVI Cat Canyon, Inc.* (C.D. Cal. 2016) 213 F.Supp.3d 1249, 1273 [applying rule of liberal construction to Porter–Cologne Act].)

B.     *The Language of Section 13304 and the Trial Court's Ruling*

As noted previously, the critical issue on appeal as to section 13304, subdivision (a) is whether UATC can be treated as a person who "caused or permitted . . . any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state." The issue turns on the degree of knowledge necessary to hold UATC responsible under section 13304 as a person who *permitted* the discharges of PCE that occurred at the Center.

In its September 2017 order, the trial court concluded the meaning of "permitted" in section 13304 is ambiguous, and we agree. As the trial court pointed out, the Water Code does not define "cause" or "permit." The term "cause" clearly connotes direct responsibility for a discharge, but the term "permit" encompasses a spectrum of conduct, from giving formal authorization for a discharge to allowing the activity that caused the discharge. That is because "permit" is defined as "To allow the occurrence of (an action, etc.); to allow (something) be carried out or to take place; to give permission or opportunity for." (*Oxford English Dictionary* Online, http://www.oed.com, as of Nov. 21, 2019.) Similarly, the American Heritage Dictionary defines "permit" to include "[t]o allow the doing of (something)," "[t]o grant consent or leave to (someone)," and "[t]o afford opportunity or possibility for." (*American Heritage Dictionary* Online, http://ahdictionary.com, as of Nov. 21, 2019.)

The trial court stated it could "discern at least five possible interpretations of 'permitted' " as used in section 13304, subdivision (a), as to "whether there is a knowledge requirement." The options identified by the court include: (1) " 'Permitted' is a strict liability standard with no knowledge requirement;" (2) " 'Permitted' requires that a landowner know or should have known of the activities at the location that caused the

14

discharge, even if the landowner had no knowledge of any discharge or heightened risk of discharge;" (3) " 'Permitted' requires that a landowner know or should have known that the activities at the location are *generally* known to pose a reasonable suggestion of a discharge but still allowed the activities;" (4) " 'Permitted' requires that a landowner know or should have known that the activities at the location *specifically* pose a reasonable suggestion of a discharge but still allowed the activities;" and (5) " 'Permitted' requires that a landowner know or should have known that a specific activity [at] a location caused a discharge at that specific location, failed to take corrective action, and still allowed the activities." We would word the third and fourth options differently—and we ultimately *do* word our holding differently in selecting an interpretation comparable to option three—but the trial court's list fairly captures the range of potential interpretations.

The trial court observed that the Regional Board used the second interpretation of "permitted" in including UATC in the Cleanup Order and that UATC argued for the fifth standard. The court reviewed the legislative history, past State Board decisions on the subject, and cases from other contexts, including *Laube*, *supra*, 2 Cal.App.4th 364—a 1992 decision from this court determining when a liquor licensee can be said to have "permitted" criminality at an establishment. Ultimately, the trial court concluded the fourth option was the proper interpretation of the statute, albeit with different wording— asking whether UATC had "actual or constructive knowledge of either a specific discharge or of a dangerous condition that poses a reasonable suggestion of a discharge at the site." The trial court stated it was following *Laube* in adopting that interpretation, which closely parallels the definition of "permitted" in *Laube* (see Part I.D.2, *post*). As noted previously, we understand the trial court's reference to "a dangerous condition that poses a reasonable suggestion of a discharge at the site" to mean a specific condition at a site that creates a risk of discharge. This is consistent with the court's articulation of the third and fourth options as quoted above, which contrast a risk of discharge *generally* associated with an activity with a risk arising from a *specific* aspect of a lessee's operation. We understand the trial court's reference to activities that "*specifically*" pose a

15

risk of discharge to refer to the specific conditions at the site, in contrast to activities "*generally*" known to present a risk of discharge without reference to the specific conditions at the site. Further, that understanding is consistent with the cases relied upon by the court in devising its standard, as explained below (Parts I.D. and I.E., *post*).

Viewing the facts in light of its test, the trial court summarized information in the record about UATC's knowledge of the specific dry cleaning operation at the Center, including the evidence that UATC obtained a building permit for the dry cleaner in 1961, was informed in 1962 the dry cleaner had taken occupancy, and was aware of a "Fire Marshal permit disclosing that the dry cleaner used solvents, that the solvents had to be processed in approved equipment, and that the solvents had to be transferred only in an approved piping system." The court continued, "The Fire [Marshal]'s issuance of a special permit is evidence that UATC knew that the dry cleaner used solvents and that the use of solvents is dangerous. It is also arguably evidence that UATC obtained all the necessary permits and could reasonably conclude that this particular dry cleaner was in compliance with all existing safety requirements. The issuance of a special permit is not direct evidence that the activities at this particular dry cleaner posed a reasonable suggestion of a discharge at the site. [¶] The [Regional Board's] knowledge finding was also based on evidence of a 'historical record' that 'shows that UATC should have known of the use of chemicals at the Site and its dangers, including the potential for unauthorized discharges. [Citation.] The court cannot locate a relevant 'historical record' in the Administrative Record. . . . Furthermore, general knowledge that dry cleaners can discharge hazardous chemicals is not direct evidence that the activities at this particular dry cleaner posed a reasonable suggestion of a discharge at the site."

The trial court declined to determine whether the evidence supported naming UATC in the Cleanup Order. Instead, the court stated it would "remand the matter to the Regional Board for further proceedings under the correct definition of 'permitted' in [section 13304]." The court's October 2017 judgment states, "After the Regional Board sets aside and vacates the [Cleanup] Order, the Regional Board may conduct further proceedings consistent with applicable law, this court's order dated 9/29/17, and this

16

judgment. The court does not limit or control in any way the discretion legally vested in the Regional Board. (Code Civ. Proc. § 1094.5(f).)"[11]

As explained below, although the trial court properly concluded section 13304 requires some evidence of knowledge of the risk of a discharge on the part of a prior owner named in a cleanup order, the court erred in requiring evidence that the prior owner knew or should have known of a specific discharge or dangerous condition.

### C. *The Legislative History*

As enacted in 1969, section 13304, subdivision (a) provided in relevant part that, "Any person who . . . intentionally or negligently causes or permits any waste to be deposited where it is discharged into the waters of the state and creates a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof." (Stats. 1969, ch. 482, § 18, p. 1066.) It appears that wording was derived from former section 151 of the Harbors and Navigation Code, which was enacted in 1968 to provide, in relevant part, "any person that intentionally or negligently causes or permits any oil to be deposited in the water of this state, including but not limited to navigable waters, shall be liable civilly in an amount not exceeding six thousand dollars ($6,000) and, in addition, shall be liable to any governmental agency charged with the responsibility for cleaning up or abating any such oil for all actual damages, in addition to the reasonable costs actually incurred in abating or cleaning up the oil deposit in such waters." (Stats. 1968, ch. 1259, § 1, pp. 2377–2378.)[12]

In 1970, section 13304, subdivision (a) was amended to include situations where waste "probably will be" deposited or "discharged" and "threatens to create" a nuisance.

---

[11] Thus, contrary to an assertion by UATC's counsel at oral argument, the trial court did not make findings regarding what knowledge UATC had or should have had regarding the risk of PCE discharges.

[12] Section 151 of the Harbors and Navigation Code is referenced in the Study Panel Report that led to the enactment of section 13304. (Study Panel Report, Appendix A, at p. 113.)

17

(Stats. 1970, ch. 918, § 5.3, p. 1669.)  In 1971, section 13304 was further amended, but not in any relevant respects.  (Stats. 1971, ch. 1288, § 11, pp. 2525–2526.)

Thus, before 1980, section 13304, subdivision (a) provided, in relevant part, that "Any person who . . . intentionally or negligently causes or permits any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall upon order of the regional board clean up such waste or abate the effects thereof or, in the case of threatened pollution or nuisance, take other necessary remedial action."  (Former § 13304, subd. (a).)  In 1980, the Legislature enacted Assembly Bill 2700 (AB 2700), which amended provisions of the Health and Safety Code and the Water Code to expand the authority of the State Director of Health Services and of regional water quality control boards to address hazardous waste control and cleanup.  (Stats. 1980, ch. 808, pp. 2537–2540.)  As to section 13304, the relevant language was changed to read, "A person who . . . has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance, shall, upon order of the regional board, clean up the waste or abate the effects thereof, or, in the case of threatened pollution or nuisance, take other necessary remedial action."  (Stats. 1980, ch. 808, § 3, p. 2538; see also *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th at p. 435.)

As to the 1980 changes to the Water Code, the Legislative Counsel's Digest to AB 2700 explained, "Existing law . . . authorizes a regional water quality control board to order cleanup of waste which creates or threatens to create a condition of pollution or nuisance, as specified, or to expend available moneys to take remedial action and recover reasonable costs actually incurred in such remedial action. [¶] This bill would, additionally, authorize a regional water quality control board to order cleanup or remedial action for past discharge or deposit of waste, as specified."  (See *Van Horn v. Watson* (2008) 45 Cal.4th 322, 332, fn. 11 ["Although the Legislative Counsel's summary digests are not binding, they are entitled to great weight."].)  That summary focuses on the

18

expansion of authority to include past discharges, but the actual amendment did not only add language to the statute encompassing those discharges.  In addition, the Legislature struck out the language limiting those subject to cleanup and abatement orders to those who "intentionally or negligently" cause or permit waste discharges.  (Stats. 1980, ch. 808, § 3, p. 2358.)  Under the AB 2700 changes, all persons who cause or permit, past, present, or threatened discharges may be named in a cleanup order; the statute does not expressly require a showing of intentional or negligent conduct with respect to the discharge.[13]

Below, we briefly address the parties' arguments about the legislative history to the 1980 legislation, AB 2700.  However, the most critical language—the phrase "causes or permits"—was actually included in section 13304 when it was enacted in 1969, apparently based on use of the phrase in section 151 of the Harbors and Navigation Code.[14]  As explained previously, the 1969 enactment was based upon the work of a State Board Study Panel.  We have reviewed the Study Panel Report; the legislative history to the 1969 enactment of section 13304; the legislative history to the 1970, 1971, and 1980 amendments to section 13304; and the legislative history to section 151 of the Harbors and Navigation Code.  None of those materials offer any insight regarding the meaning of the term "permit" as used in section 13304.

> 1. *The Regional Board's Argument that AB 2700 Converted Section 13304 Into a Strict Liability Statute*

The Regional Board argues that, in amending section 13304 in 1980, the Legislature intended to impose strict liability on prior owners for discharges by lessees

---

[13] AB 2700 also added language presently in section 13304, subdivision (j), providing, "This section does not impose any new liability for acts occurring before January 1, 1981, if the acts were not in violation of existing laws or regulations at the time they occurred." UATC does not argue that provision precludes its liability under the Cleanup Order.

[14] In *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 42, the California Supreme Court observed that section 151 of the Harbors and Navigation Code is not a strict liability statute because it requires a showing that oil deposits were intentional or negligent, but the court did not address the meaning of the term "permits."

19

because the Legislature removed from the statute a requirement to show persons named in a cleanup order for permitting a discharge acted "intentionally or negligently."[15] However, a true strict liability statute would impose liability on an owner whose lessee discharged hazardous waste into the state's water supply whether or not the owner knew of the tenant's activities.[16] The Regional Board does not construe the statute in that manner. Instead, it recognizes that the term "permitted" requires some knowledge by the owner of the lessee's activities. The Regional Board's strict liability position is properly understood as an argument that "permitted" should be interpreted broadly, imposing only a limited knowledge requirement—once an owner has the requisite knowledge, no steps taken in response will protect it from liability. As the Regional Board states in its reply brief, "a person can have knowledge, and act either intentionally, negligently, or without fault . . . The question remains what the term 'permit' means . . . and what kind of knowledge that might require."[17]

2. *The State Board's Statement of Purpose and The Ways and Means Staff Analysis*

The legislative history shows the State Board requested the amendments to section 13304 enacted in AB 2700, emphasizing the need for clearer authority with respect to

---

[15] At least one treatise supports the Regional Board's interpretation, commenting that "the position of the regional boards appears justified by the history of the section. . . . The deletion of ['intentionally or negligently'] strongly suggests that the state legislature intended to impose strict liability." (11 Miller & Starr, *California Real Estate*, § 39:57, fn. 5 (4th ed. 2017); see also *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th at p. 435.)

[16] In fact, such a statute might well hold an owner liable for the acts of an unknown trespasser. (See *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605, 621 (*Leslie Salt*).)

[17] "Permitted" may also require evidence of how a prior owner responded once it became aware of the risk of harm. Phrased differently, may we conclude a party "permitted" a discharge if it took all reasonable steps to prevent its occurrence? In the present case, UATC does not claim it took any steps to prevent discharges of hazardous wastes from the dry-cleaning operation, so we have no occasion to consider whether any such showing could provide a basis to avoid being named in a cleanup order. The only issue in the present appeal is the extent of the knowledge of the possibility of a discharge required by the term "permitted" in section 13304.

20

past discharges.  For example, the State Board's "Request for Approval of Proposed Legislation" identified as the problem to be remedied the circumstance that the Porter-Cologne Act "address[es] only present or threatened future discharges."  The "Proposed Solution" was an amendment to section 13304, subdivision (a) "to expressly provide for issuance of cleanup and abatement orders for past and threatened future discharges [which would] eliminate potential challenges to Regional Board authority to respond to this type of occurrence by administrative order."

The only legislative committee analysis that makes any reference to omission of "intentionally or negligently" from section 13304 is the Ways and Means Committee staff analysis.  That analysis is an important part of the legislative history.  As the California Supreme Court explained, "it is well established that reports of legislative committees and commissions are part of a statute's legislative history and may be considered when the meaning of a statute is uncertain" because "it is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some explanation of how the measure was understood at the time by those who voted to enact it."  (*Hutnick v. U.S. Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 (*Hutnick*); accord *People v. Johnson* (2015) 60 Cal.4th 966, 999.)

The Ways and Means Committee analysis states that AB 2700 "Authorizes the regional quality control board to order cleanups and remedial action for past or threatened future discharge of waste."  (Assem. Com. on Ways and Means, Analysis of Assem. Bill 2700 (1980 Reg. Sess.), as amended April 15, 1980.)  The analysis describes in detail the amendments to the Health and Safety Code and then briefly addresses the amendments to the Water Code, stating "This bill would allow the regional boards to order cleanups for past or threatened future discharges of waste.  In addition, it would allow the board to recover reasonable cleanup costs from responsible parties without having to prove negligence."

21

The legislative history to AB 2700 contains no other materials that are relevant to determining the meaning of "permitted" as used in section 13304.[18]

### 3. *Conclusions Regarding Legislative History*

As summarized above, the legislative history to AB 2700 contains little direct guidance regarding the meaning of "permitted" in section 13304. It does, however, generally reflect an intent to expand the ability of regional boards to name prior owners in cleanup orders. As the Fourth District recently observed in *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th at page 435, "changes made to the statute's language over time evince a legislative intent to expand the regional boards' ability to name responsible persons. For example, cleanup or abatement orders may be issued to past, present, and future dischargers of waste; the boards need not prove a person's intent in discharging waste (the words 'intentionally or negligently' were deleted by the 1980 amendment); and the Legislature empowered regional boards to issue orders to prevent and/or correct threatened harm, that is, when waste has not yet even reached the state's waters."

The parties particularly focus on the Legislature's elimination of the phrase "intentionally or negligently" from section 13304. On appeal, UATC suggests this court should decline to give significance to AB 2700's elimination of the requirement of showing negligence, given that it is not explained in the legislative history. The trial court agreed, observing that the history did not address whether "the [L]egislature deleted the phrase 'intentionally or negligently' because it was inconsistent with the additional authority for 'threatened' discharges, to create strict liability, to eliminate redundancy because it was duplicative when placed before 'cause or permit' . . . or something else."

---

[18] The Regional Board refers to statements in a Department of Justice memorandum and a Department of Fish and Game bill analysis that support their contention that section 13304, as amended by AB 2700, imposes strict liability. It unclear whether it is appropriate for this court to consider those analyses, absent any indication they were available to the full Legislature. (See *Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062; *Hutnick*, *supra*, 47 Cal.3d at p. 465, fn. 7.) In any event, even if it were appropriate to consider them, they do not address the meaning of the word "permitted" in section 13304.

Like the trial court, UATC cites to the California Supreme Court's decision in *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158 (*Jones*), in which the question was, in the employment context, "whether personal liability exists where the statute prohibits retaliation by 'any employer, labor organization, employment agency, or person.' " (*Id.* at p. 1163.) The court concluded the Legislature did not intend to impose personal liability and stated that "the *absence* of legislative history, behind the inclusion of the word 'person' " supported its conclusion. (*Id.* at p. 1169.) The court observed it is " 'highly unlikely that the Legislature would make such a significant change in the potential liability of individuals without so much as a passing reference to what it was doing.' " (*Id.* at p. 1171, brackets in quotation omitted.)

The *Jones* decision is distinguishable. The addition of the word "person" was one among several changes. (*Jones*, *supra*, 42 Cal.4th 1158 at p. 1169.) The Legislative Counsel's Digest described certain of the amendments but did not refer to the section at issue in the case; "[i]nstead, it said only, 'The bill would, in addition, make various *technical and conforming* changes to the act.' " (*Ibid.*) The Supreme Court therefore interpreted the addition of the word as a technical change to "conform[] to the use of the word in describing some of the unlawful employment practices the retaliation provision references." (*Id.* at p. 1170.) A bill analysis from the department that prepared the legislation described it as " 'a technical clean-up bill to clarify various sections . . . and make standards . . . more consistent between subsections.' " (*Jones*, at p. 1170.) In contrast, although the legislative history is largely silent regarding the elimination of the requirement to show intent or negligence, the bill itself was described as substantive and important to waste cleanup in the state. Furthermore, the significance of eliminating the phrase "intentionally or negligently" would have been obvious to any legislator, as those are well-recognized, meaningful concepts. Deletion of the phrase at issue is not the kind of change we can treat as non-substantive, or one a legislator would have been likely to overlook.

Accordingly, we decline UATC's suggestion to treat the amendments as lacking *any* substantive effect. (See *People v. Dillon* (1983) 34 Cal.3d 441, 467 [" 'It is

ordinarily to be presumed that the Legislature by deleting an express provision of a statute intended a substantial change in the law.' "].) Further, we agree with the Regional Board to the extent it argues that the elimination of the phrase "intentionally or negligently" in 1980 favors a broader interpretation of the term "permitted." This provides additional support for our decision to construe "permitted" more broadly than did the trial court.

D. *Other Authority Regarding the Meaning of the Term "Permitted"*

1. *Section 13305*

Before turning to caselaw related to the term "permit," we observe that section 13305, also enacted in 1969 by Assembly Bill No. 413 (Stats. 1969, ch. 482, § 18, pp. 1067–1068) upon recommendation of the Study Panel Report (Study Panel Report, Appendix A at pp. 68–70, 118-119), provides support for this court's conclusion that "permit" in section 13304 requires a showing of an awareness of a risk of discharge before a prior owner may be named in a cleanup order.

Section 13305 provides that property owners are broadly responsible for the cost of cleanups associated with "nonoperating industrial or business location(s)." (§ 13305, subd. (a).) Thus, under section 13305, subdivision (a), "[u]pon determining that a condition of pollution or nuisance exists that has resulted from a nonoperating industrial or business location within its region, a regional board may cause notice of the condition to be posted upon the property in question. The notice shall state that the condition constitutes either a condition of pollution or nuisance that is required to be abated by correction of the condition, or a condition that will be corrected by the city, county, other public agency, or regional board at the property owner's expense." Upon complying with the notice requirements and considering any timely objections, and following the failure of local governmental entities to perform cleanup, "the regional board shall cause the condition to be abated." (§ 13305, subd. (e)(2).)

Critically, section 13305, subdivision (f) provides, "*The owner of the property on which the condition exists, or is created, is liable for all reasonable costs incurred* by the regional board or any city, county, or public agency in abating the condition. The amount

24

of the cost for abating the condition upon the property in question constitutes a lien upon the property so posted upon the recordation of a notice of lien." (Emphasis added.) Accordingly, in the section 13305 context, a property owner may be held responsible for cleanup costs without any showing that the owner caused or permitted the discharges.

Thus, at the same time the Legislature enacted section 13304 requiring a showing that a person caused or permitted a discharge to hold them responsible for cleanup, the Legislature *also* enacted section 13305 holding a current property owner responsible for cleanup associated with a nonoperating business without any showing that the owner caused or permitted the discharges that created the condition of pollution or nuisance.[19] If this court were to adopt the Regional Board's proffered interpretation of section 13304—holding a past owner responsible for all discharges from activities the owner knew about—it would come very close to the liability provided for in section 13305, despite the absence of the cause or permit language in that section. Accordingly, although section 13305 does not define "permit" as used in section 13304, it does offer strong support for our conclusion that the Legislature intended that the term provide some limitation on the scope of an owner's liability for a tenant's discharges beyond mere knowledge of the nature of tenant's business. (See *Ivory Education Institute v. Dept. of Fish & Wildlife* (2018) 28 Cal.App.5th 975, 983 ["Statutes should be interpreted with reference to the whole system of law of which they are a part, and sections relating to the same subject must be read together and harmonized."].) We do not believe the Regional Board's definition, which essentially exempts property owners from liability only where

---

[19] The scope of application of section 13305 is not entirely clear. Section 13305, subdivision (h) provides, "As used in this section, the words 'nonoperating' or 'not in operation' mean the business is not conducting routine operations usually associated with that kind of business." The one published case that addresses section 13305 in any detail—*Barry*, *supra*, 194 Cal.App.3d 158—involved a non-operational copper mine, but the language of section 13305 is not limited to any particular type of business. (See also Stats. 1969, ch. 482, § 33, p. 1088 [Assembly Bill No. 413 statement of intent regarding section 13305].)

25

they were deceived as to a tenant's activities, provides any meaningful limitation on liability.

We next turn our attention to pertinent caselaw for guidance in defining "permitted."

### 2. *Cases in the Porter–Cologne Act Context*

Cases in the Porter–Cologne Act context provide little guidance regarding the meaning of the term "permitted."

In *Modesto I*, *supra*, 119 Cal.App.4th 28, the court of appeal considered whether manufacturers of dry-cleaning equipment, and manufacturers and distributors of dry-cleaning solvent "cause[d] wastes to be discharged or deposited" within the meaning of section 13304. (*Modesto I*, at p. 35.) The court of appeal observed that the statute did not make clear whether "cause" referred to "a party who was directly involved with a discharge, to anyone whose actions were a substantial factor in causing the discharge, or even . . . to anyone who places a hazardous substance into the chain of commerce." (*Id.* at p. 37.) Turning to nuisance law for guidance (see Part I.E., *post*), the court rejected the defendants' contention that "only those who are physically engaged in a discharge or have the ability to control waste disposal activities" can be held liable for the nuisance the discharge creates. (*Id.* at p. 41.) The court concluded that, "construing . . . section 13304, subdivision (a) 'in light of the common law principles bearing upon [nuisance]' [citation], we conclude that those who took affirmative steps directed toward the improper discharge of solvent wastes—for instance, by manufacturing a system designed to dispose of wastes improperly or by instructing users of its products to dispose of wastes improperly—may be liable under that statute, but those who merely placed solvents in the stream of commerce without warning adequately of the dangers of improper disposal are not liable under that section of the Porter–Cologne Act." (*Modesto I*, at p. 43.)

The *Modesto I* decision thoughtfully applied section 13304 to the novel claims before the court, but it focused on the meaning of the term "cause" and did not attempt to define the independent term "permit." (*Modesto I*, *supra*, 119 Cal.App.4th at pp. 36–37.)

26

The court did not consider under what circumstances an owner could be held responsible for a tenant's discharges under section 13304, characterizing its conclusion as "that the Legislature did not intend the act to impose liability on those with no ownership or control over the property or the discharge, and whose involvement in a discharge was remote and passive." (*Id.* at p. 43; see also *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th at p. 442 ["The *Modesto* opinions discuss the issue of causation in the context of whether defendants who had no physical control over the discharged waste . . . could be found a 'cause' of the discharge based on the equipment they designed or instructions they gave."].)

The decision in *TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291, also provides little guidance regarding the meaning of "permit." There, a landowner challenged a $25,000 fine imposed by a regional board due to a chemical spill (also PCE) on the owner's property that resulted in groundwater contamination. The spill occurred due to an error by someone working for a contractor hired by the owner to perform demolition. (*Id.* at p. 293.) The fine was imposed in part under section 13350, subdivision (b)(1), which provides for civil liability for "Any person who, *without regard to intent or negligence, causes or permits* any hazardous substance to be discharged in or on any of the waters of the state . . . ." (*TWC Storage*, at p. 295.) The court of appeal concluded there was sufficient evidence the landowner " 'cause[d] or permit[ted]' the discharge to occur by engaging contractors to perform the demolition activity that resulted in the discharge." (*Id.* at p. 298.) *TWC Storage* is distinguishable from the present case because the landowner there actually contracted for the work that resulted in the discharge.

Finally, in *San Diego Gas & Electric*, *supra*, 36 Cal.App.5th 427, a power plant operator that had discharged waste into San Diego Bay contended it could not be named in a section 13304 cleanup order absent proof of causation under the common law "substantial factor" test. (*San Diego Gas & Electric*, at p. 431.) The court of appeal rejected that contention, in light of the Legislature's intent "to expand the regional boards' ability to name responsible persons" (*id.* at p. 435) and caselaw from the nuisance

context enjoining dischargers even where there were other contributors to the pollution (*id.* at pp. 436–439). The *San Diego Gas & Electric* decision is fully consistent with the present decision, but it provides no direct guidance regarding the meaning of the term "permit" because in that case it was "undisputed on appeal that [the company] directly discharged and thus 'caused or permitted' waste to enter the Bay." (*Id.* at p. 431.)

3. *The Decision in* Laube v. Stroh

As noted previously, the trial court followed a 1992 decision of this court, *Laube*, *supra*, 2 Cal.App.4th 364, in adopting its definition of "permitted," requiring the Regional Board to show that UATC had "actual or constructive knowledge of either a specific discharge or of a dangerous condition that poses a reasonable suggestion of a discharge at the site." As explained below, *Laube* did not interpret a statute using the term "permitted," and the definition of "permitted" employed in *Laube* was due to constitutional and policy considerations not present in the section 13304 context.

In *Laube*, *supra*, 2 Cal.App.4th 364, this court considered the propriety of suspending or revoking liquor licenses "because [the licensees] allegedly 'permitted' drug sales in their establishments," despite the fact that "[n]either licensee knew or had reason to know of the drug trafficking." (*Id.* at p. 366.) The case did not involve a statute that employed the term "permitted;" the revocation was under a provision authorizing action "When the continuance of a license would be contrary to public welfare or morals." (Bus. & Prof. Code, § 24200, subd. (a).) *Laube* rejected imposition of "strict liability on [every] licensee, even those running upscale establishments without a hint of suspicion of illicit conduct on their premises, simply because a drug transaction occurs." (*Laube*, at p. 377.) The decision reasoned that "[t]he concept that one may permit something of which he or she is unaware does not withstand analysis." (*Id.* at p. 373.) *Laube* held that "a licensee must have knowledge, either actual or constructive, before he or she can be found to have 'permitted' unacceptable conduct on a licensed premises." (*Id.* at p. 377.; see also *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 585 [an employer "suffers or permits" an employee to work within the meaning of overtime laws where the "employer knows or has reason to believe that [the employee] is

28

continuing to work."]; *United States v. Launder* (9th Cir. 1984) 743 F.2d 686, 689 [in the context of a statute regarding out of control forest fires, stating, "[t]he legal terms 'permitting' and 'suffering' clearly require a willful act or a willful failure to act in the face of a clear opportunity to do so"].)

Contrary to the Regional Board's contention that the term "permitted" in section 13304 imposes only the limited burden of showing an owner was aware of the general activity that resulted in a discharge, *Laube* supports the position that before an owner can be said to have "permitted" harm resulting from a lessee's conduct, there must be some basis to conclude that the owner was aware or should have been aware of the reasonable possibility that harm would occur—in this case the discharge of hazardous wastes. On the other hand, we disagree with the trial court's conclusion that the precise definition of "permit" employed in *Laube* applies in the section 13304 context.[20]

*Laube* required specific knowledge of the prohibited activity, but that court's analysis makes it clear that different statutory and regulatory schemes call for different standards of knowledge. In requiring a strenuous showing of knowledge to support a finding that an owner permitted illegal activity, *Laube* relied upon the fact that "liquor licensees . . . enjoy a constitutional standard of good cause before their license—and quite likely their livelihood—may be infringed by the state." (*Laube*, *supra*, 2 Cal.App.4th at p. 377.) That is, the court in *Laube* was determining what circumstances constitute good cause for action against a licensee, and the court therefore adopted a definition of "permitted" that only held licensees responsible for criminality in their

---

[20] We observe that the *Laube* court recognized a licensee has "the obligation to be diligent in anticipation of reasonably possible unlawful activity." (*Laube*, *supra*, 2 Cal.App.4th at p. 379.) However, because of special considerations in the context of the case, the court concluded a licensee could only be held responsible for unlawful activity it actually knew about. The section 13304 context differs and supports a construction of "permitted" that permits a Regional Board to name an owner in a cleanup order where, in the language of *Laube*, the owner had "the obligation to be diligent" because it knew or should have known that a lessee's activity made the discharge of hazardous wastes "reasonably possible." (*Laube*, at p. 379.)

29

establishments where they acted in a blameworthy manner. Furthermore, the *Laube* court was also concerned that holding licensees broadly responsible for criminality in their establishments, without any prior awareness of illegal behavior, would lead owners to implement "severe surveillance regime[s]." (*Id.* at pp. 378–379.) Thus, *Laube* observed that the Alcoholic Beverage Control Appeals Board "would impose an Orwellian regime of surveillance, polygraph testing and undercover spying in an establishment of impeccable morals or of the finest *nouvelle cuisine*." (*Id*. at p. 378.)

In contrast, in the present case this court is interpreting "permitted" as used in section 13304, not a "good cause" provision that arguably requires heightened blameworthiness as a predicate for liability. Furthermore, where in *Laube* the court emphasized the potential negative consequences to the public that could result from excessive vigilance on the part of licensees, UATC has identified no similar negative consequences from such vigilance in the section 13304 context. To the contrary, the public has a strong interest in preventing the discharge of hazardous wastes and would benefit from greater vigilance on the part of property owners. In enacting the Porter–Cologne Act, the Legislature found and declared "that the people of the state have a primary interest in the conservation, control, and utilization of the water resources of the state, and . . . [¶] . . . [¶] . . . the state must be prepared to exercise its full power and jurisdiction to protect the quality of waters in the state from degradation originating inside or outside the boundaries of the state . . ." (§ 13000.) We liberally construe section 13304, including the word "permit," to accomplish that objective. (*Coastside Fishing Club*, *supra*, 158 Cal.App.4th at p. 1202.)[21]

---

[21] UATC's other cases are also distinguishable. *Morillion* cites only cases interpreting the equivalent phrase ("suffer and permit") in other employment cases; it does not purport to define "permit" for all purposes. (*Morillion v. Royal Packing Co.*, *supra*, 22 Cal.4th at pp. 584–585.) And, as the Regional Board points out, the relevance of *Launder* is undermined by that decision's reliance on the principle that "courts should construe statutes so as to impose strict criminal liability only when Congress clearly expresses its intent that such a standard prevail." (*United States v. Launder*, *supra*, 743 F.2d at p. 690.)

In the section 13304 context, an owner cannot be said to permit a discharge simply by allowing a lessee to operate a certain type of business, absent knowledge or constructive knowledge that, in general, the business creates a reasonable possibility of discharge. But if an owner, who necessarily profits from the activities of its lessees, knows or should know of such a risk and chooses to lease to an operator of that type of business, the owner may properly be held responsible for any discharges that occur.[22] The public has a strong interest in the cleanup of hazardous wastes and relieving owners of liability shifts the costs to others or, if there are no solvent other responsible parties, to the public. To accept the trial court's reasoning and require actual or constructive knowledge of an actual discharge or specific dangerous conditions in a lessee's operation would excuse the owner from any obligation to mitigate the risk of discharge by, for example, supervising the lessee's activities or imposing contractual requirements on the lessee with respect to any discharge. The trial court's standard also encourages owners to remain ignorant about tenants' specific activities, which decreases their opportunities to prevent discharges. We believe the standard we adopt is the proper construction of "permit" in the context of section 13304.

E.    *Nuisance Law*

UATC argues interpreting section 13304 to require knowledge of a discharge before naming a prior owner is "consistent with the law of nuisance." UATC points out that section 13304, subdivision (a) references "nuisance," authorizing a cleanup order as to waste that "creates, or threatens to create, a condition of pollution or *nuisance*." (Italics added.) UATC further points out that, based on that reference and the definition of nuisance in section 13050, subdivision (m), the court in *Modesto I*, *supra*, 119 Cal.App.4th at p. 38, concluded, "the Legislature not only did not intend to depart from

---

[22] Again, we need not and do not decide whether an owner could avoid liability under a cleanup order by showing it took reasonable steps to avoid a discharge. (See Part I.C.1, *ante*.)

the law of nuisance, but also explicitly relied on it in the Porter–Cologne Act." (*Modesto I*, at p. 38.)

As explained above, in *Modesto I*, *supra*, 119 Cal.App.4th 28, the court of appeal considered when manufacturers and distributors of dry-cleaning equipment and solvent can be held responsible as persons who "cause[d] wastes to be discharged or deposited" within the meaning of section 13304. (*Modesto I*, at p. 35.) The court relied on nuisance law to resolve that question, stating that the Porter–Cologne Act "appears to be harmonious with the common law of nuisance." (*Modesto I*, at p. 37.)

UATC argues that, under *Modesto I*, this court should construe section 13304 to impose no greater liability on a landowner than would be imposed under the common law of nuisance. However, UATC points to no definition of "permitted" in nuisance law. Instead, UATC cites to *Resolution Trust Corp. v. Rossmoor Corp.* (1995) 34 Cal.App.4th 93 (*Rossmoor*), for the proposition that landowners can only be held liable for a tenant's nuisance if the owner knows of the condition. In that case, the plaintiff sued the owner of a neighboring parcel for "nuisance, trespass, and negligence" due to gasoline contamination from a gas station operated on the defendant's parcel. (*Id.* at pp. 98–99.) The court of appeal agreed the fuel leaks constituted a continuing nuisance, and the court held "[t]he defendant [landlord] must be aware of the specific dangerous condition and be able to do something about it before liability will attach." (*Id.* at p. 102.) The court reasoned that "modern cases on landlord liability for hazards created by a tenant have turned on negligence based on knowledge, or at least a reason to know, of the hazard." (*Id.* at p. 100, fn. 6; see also *id.* at p. 100 [noting that "when the nuisance is created by another[, s]ome form of negligence by the landowner is required"].) Accordingly, *Rossmoor* stands for the proposition that a landlord can be held liable for a tenant's nuisance upon a showing of negligence. (See also *Lussier v. San Lorenzo Valley Water Dist.* (1988) 206 Cal.App.3d 92, 104 ["proof of negligence may be essential to a claim of nuisance where the alleged nuisance involves a failure to act"].)

In *Rossmoor*, the landlord's potential liability turned on whether it acted negligently, not on whether the landlord "permitted" the discharges resulting in the

nuisance. (*Rossmoor*, *supra*, 34 Cal.App.4th at pp. 100–101.) Therefore, the *Rossmoor* court had no occasion to define "permit," and it offers no direct guidance regarding the meaning of the term in section 13304.[23] Furthermore, in *Rossmoor* a regional water board had issued a cleanup order against the landowner, presumably under section 13304, based on a finding that the landowner "caused or permitted" the discharge. (*Rossmoor*, at p. 105.) The court of appeal observed that the regional board "did not purport to find or adjudicate whether the defendants had a duty to prohibit the leakage from reaching [the plaintiff's] property in the first place." (*Ibid.*) Thus, in that case the landowner was subject to a section 13304 cleanup order, but the owner was *not* held liable for the neighbor's damages from the nuisance. Our construction of section 13304 is consistent with that result, while the trial court's interpretation would be inconsistent with that result—an owner that had sufficient knowledge to satisfy the trial court's standard would also have sufficient awareness of risk to give rise to a duty of care in the nuisance context.

Finally, adopting a negligence test for "permitted" seems clearly inconsistent with the Legislature's 1980 amendment deleting "negligently" from section 13304.

F.      *The Relevant State Board Decisions Are Inconsistent but Support a Limited Showing of Awareness of Risk of Discharge*

The Regional Board argues that its interpretation of section 13304 is supported by a number of State Board administrative decisions reviewing regional board actions. Although we believe the decisions are due less deference than the Regional Board contends, it ultimately makes no difference because the decisions fail to disclose a consistent interpretation of "permitted" in section 13304. The decisions do, however, support a conclusion that section 13304 requires some meaningful showing of awareness of the risk of discharge to justify naming a prior owner in a cleanup order.

1.      *The State Board Decisions Are Due Only Limited Deference*

_____

[23] Neither does the other case UATC cites, *Reinhard v. Lawrence Warehouse Co.* (1940) 41 Cal.App.2d 741, 746, define "permit" or "permitted" in the nuisance context.

The Regional Board argues that this court "must defer" to the State Board's decisions "unless the interpretation flies in the face of the clear language and purpose of the interpreted provision." (*Communities for a Better Environment v. State Water Resources Control Bd.* (2003) 109 Cal.App.4th 1089, 1104 (*Communities*).) But, as the California Supreme Court explained in *Yamaha*, *supra*, 19 Cal.4th 1, "there are two categories of administrative rules and . . . the distinction between them derives from their different sources and ultimately from the constitutional doctrine of the separation of powers. One kind—quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Id.* at pp. 10–11.) The court continued, "It is the other class of administrative rules, those *interpreting* a statute, that is at issue in this case. Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion*, however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference." (*Id.* at p. 11.)

Review of quasi-legislative rules is limited " 'to a determination whether the agency's action is arbitrary, capricious, lacking in evidentiary support, or contrary to procedures provided by law,' " but when an agency construes a statute, courts take

"ultimate responsibility for the construction of the statute" while according "great weight and respect to the administrative construction." (*Yamaha*, *supra*, 19 Cal.4th at p. 12.) Because the State Board decisions involve the agency's interpretations of section 13304 rather than quasi-legislative rulemaking, we apply the lesser level of deference described in the *Yamaha* decision. Under *Yamaha*, the precise " 'weight' [an agency interpretation] should be given" is "fundamentally *situational*." (*Ibid.*) The Supreme Court outlined a number of factors, but the most important in the present case is whether "the agency 'has consistently maintained the interpretation in question.' " (*Id.*, at p. 13.) " '[A] vacillating position . . . is entitled to no deference.' " (*Ibid.*)

If taken literally and applied in circumstances like those in the present case, the rule articulated in *Communities*, *supra*, 109 Cal.App.4th at p. 1104—requiring deference unless the agency "interpretation flies in the face of the clear language and purpose of the interpreted provision"—would almost always require deference to any agency interpretation of an ambiguous statute. That would be is inconsistent with this court's "ultimate responsibility for the construction of the statute." (*Yamaha*, *supra*, 19 Cal.4th at p. 12.) To the extent *Communities* is inconsistent with *Yamaha*, we of course follow the California Supreme Court.[24]

> 2. *The State Board Decisions Do Not Reflect a Consistent Rule*

---

[24] *Communities* and most of the other cases cited by the Regional Board involved the issuance of permits and regulations. (*Communities*, at p. 1091 [review of discharge permit]; *Divers' Environmental Conservation Organization v. State Water Resources Control Bd.* (2006) 145 Cal.App.4th 246, 250 [same]; *Mendoza v. Town of Ross* (2005) 128 Cal.App.4th 625, 632 [involving "regulations enacted by the Department of Fair Employment and Housing"]; but see *Arnold v. California Exposition & State Fair* (2004) 125 Cal.App.4th 498, 507 [deferring under *Communities* standard to Department of General Services determination that a contract did not legally required competitive bidding].) It is beyond the scope of this decision to opine whether those cases involved quasi-legislative rulemaking within the meaning of *Yamaha*. In another case, *Bernard v. City of Oakland* (2012) 202 Cal.App.4th 1553, CalPERS' interpretation of a new statute was due deference as a contemporaneous administrative interpretation, which principle is not applicable in the present case. (*Id.* at p. 1565.)

35

In any event, even if we were required to give great deference to a State Board interpretation reflected in its decisions, we would be unable to do so in the present case because the decisions cited by the Regional Board do not reflect a consistent interpretation of section 13304 as to the knowledge required to hold a former owner liable for permitting a discharge.

In the most recent decision cited by the Regional Board on the issue, *In re Wenwest, Inc.* (Order No. WQ 92-13, Oct. 22, 1992) 1992 Cal. ENV LEXIS 19 (Cal.St.Wat.Res.Bd.), the State Board considered whether it was proper for a number of parties that had some connection to the site of a former gasoline service station to be named in a cleanup order, including the owner of the site during the period of operation of the station (Phillips Petroleum Company), the current owners of the site, and a past owner who did *not* own the property while it was a service station (Wendy's International). (*Id.* at pp. *1–2.) The State Board concluded it was proper to name the current owners, who had "the obligation to prevent an ongoing discharge caused by the movement of the pollutants on their property, even if they had nothing whatever to do with putting it there." (*Id.* at p. *6.) On the other hand, it was not proper to name Wendy's International because the corporation was "a former landowner who had no part in the activity which resulted in the discharge of the waste and whose ownership interest did not cover the time during which that activity was taking place." (*Ibid.*)

As to Phillips Petroleum Company, the State Board stated, "Under precedent established by this Board (see *Petition of John Stuart*[ (Order No. WQ 86-15, Sept. 18, 1986) 1986 Cal. ENV LEXIS 17 (Cal.St.Wat.Res.Bd.)]), we apply a three-part test to former owners: (1) did they have a significant ownership interest in the property at the time of the discharge?; (2) did they have knowledge of the activities which resulted in the discharge?; and (3) did they have the legal ability to prevent the discharge?" (*Wenwest, Inc.*, *supra*, 1992 Cal. ENV Lexis 19 at p. *5.) Although the decision does not tie that test to the language of section 13304, the test is apparently an interpretation of the "caused or permitted" standard. The State Board concluded the regional board "properly included Phillips Petroleum whose predecessor owned the property and leased it to a

36

service station operator during a time when leaks from the underground storage tanks were clearly taking place." (*Wenwest*, at p. *11.)

The decision in *Wenwest* supports the Regional Board's position in the present case, because the decision imposed liability on a prior owner based on evidence of knowledge of the general activity alone. We disagree with the trial court's view that the State Board concluded Wendy's International was not liable because it lacked actual or constructive knowledge of the risk of discharges. *Wenwest* is clear that it did not impose liability on Wendy's International because it "never owned [the site] during the time the tanks were actually leaking."

Although *Wenwest* supports the Regional Board's position, prior State Board decisions do not. The decision in *Petition of John Stuart*, *supra*, 1986 Cal. ENV Lexis 17, is cited as the basis for the rule articulated in *Wenwest*, although *Stuart* does not purport to articulate a "knowledge of the activities" test. (*Wenwest, Inc.*, *supra*, 1992 Cal. ENV Lexis 19 at p. *5.) *Stuart*, involving a lessee named in a cleanup order arising from a sublessee's gasoline station discharges, appears to express two different views on the knowledge required. In footnote two, the decision asserts, "The legislative intent to provide strict liability in this section is clear, since the statute was amended in 1980 to remove the requirement that intention or negligence be present where the discharge does not violate a Regional Board order or prohibition." (*Petition of John Stuart*, *supra*, 1986 Cal. ENV Lexis 17 at p. *7, fn. 2.) On the other hand, the decision also states, "Actual knowledge of the contamination need not be shown where it is reasonable for a person to be aware of the dangers generally inherent in the activity. In [*Petition of Harold and Joyce Logsdon* (Order No. WQ 84–6, July 19, 1984) 1984 Cal. ENV LEXIS 14 (Cal.St.Wat.Res.Bd.)] we examined factors involving general knowledge of the operation and normal dangers common to it and found that one who should have known is in the same position as one who did know." (*Petition of John Stuart*, *supra*, 1986 Cal. ENV Lexis 17 at p. *9, fn. 3.) Thus, *Stuart* can be read to require a showing that a prior owner or lessor knew or should have known about the risk of hazardous waste discharge.

In *In re San Diego Unified Port District* (Order No. WQ 89-12, Aug. 17, 1989) 1989 Cal. ENV LEXIS 14 (Cal.St.Wat.Res.Bd.), the State Board concluded a port district permitted discharge from a copper ore operation where the record showed "that the Port District knew of the potential for discharge of copper ore to San Diego Bay from [the lessee's] activities." (*Id.* at p. *8.) Without acknowledging the difference, the decision also articulated two other standards of knowledge. First, the decision asserted, "This Board has consistently taken the position that a landowner who has knowledge of the activity taking place and has the ability to control the activity has 'permitted' the discharge within the meaning of Section 13304." (*San Diego Unified Port District*, at p. 8.) Second, in a footnote the State Board referenced past decisions and asserted, "In each case, the landowner did not take an active role in the discharge but, in each case, the landowner was in a position to prevent the discharge and knew or should have known that the discharge was taking place." (*Id.* at p. 8, fn. 3.) Thus, the stated basis for the *San Diego Unified Port District* decision is knowledge of a *risk* of discharge, but the decision also references tests based on knowledge of activities and based on knowledge of actual discharges.

Finally, in *Petition of Harold and Joyce Logsdon*, *supra,* 1984 Cal. ENV LEXIS 14, the State Board concluded it was proper to name in a cleanup order individuals who were the prior owners of property where a wood treating and preserving facility operated. The decision concluded the owners had permitted discharges at the site within the meaning of section 13304 where they "either had or should have had knowledge of discharges at the site. Given the hazardous nature of the waste, such discharges can be presumed dangerous."[25] (*Logsdon*, at p. *17.)

In sum, close examination of the State Board decisions cited by the Regional Board demonstrates that the State Board has *not* taken a consistent position on the type of

---

[25] Another decision cited by UATC, *In re Zoecon Corp.* (Order No. WQ 86-2, Feb. 20, 1986) 1986 Cal. ENV LEXIS 4 (Cal.St.Wat.Res.Bd.), is inapposite because it does not discuss section 13304.

knowledge required to hold an owner liable in a cleanup order for discharges by a lessee. The Regional Board argues that the *Wenwest* decision supersedes any prior decisions. While that may be the case with respect to decision making within the State Board and regional boards, the Regional Board cites no authority that the most recent agency interpretation is the only relevant one for the purpose of determining deference under *Yamaha*, *supra*, 19 Cal.4th 1.[26] Thus, due to their inconsistency, we give the State Board decisions little weight in construing section 13304. (*Yamaha*, at p. 13.) Nevertheless, the decisions on the whole appear to recognize awareness of at least a risk of discharge is an appropriate predicate to naming a landowner in a cleanup order.

G.     *Conclusion*

We construe "permitted" in section 13304 to mean that a prior owner may be named in a cleanup order if it knew or should have known that a lessee's activity created a reasonable possibility of discharge of hazardous wastes, meaning wastes an owner knew or should have known could create or threaten to create a condition of pollution or nuisance if discharged into waters of the state. We do not address the question whether subsequent steps taken by such an owner to prevent discharges may preclude being named in a cleanup order.[27]

The Regional Board's interpretation comes close to writing "permitted" out of the statute by imposing liability under a cleanup order absent any knowledge, actual or constructive, that a lessee's activity created a risk of discharge of hazardous wastes. Such

---

[26] Given the inconsistencies in the State Board's decisions, we also decline to give significant weight to other agency materials highlighted by the Regional Board and UATC, including 1987 and 1992 State Board counsel memoranda and Regional Board orders in eight previous cases. Furthermore, we deny the Regional Board's October 24, 2018 request for judicial notice of a 1996 State Board order.

[27] As noted earlier in this decision, the State Board's most recent decisions also inquire whether the owner had "the legal ability to prevent the discharge." (*Wenwest, Inc.*, *supra*, 1992 Cal. ENV Lexis 19 at p. *5.) On that issue, the trial court held "as a matter of statutory interpretation that 'permits' . . . has a control component" and observed "[t]he parties agree on this legal issue." We do not address the issue, which is not raised in the briefs on appeal.

a construction of section 13304 would impose liability almost as broad as that imposed in section 13305 on a current property owner with respect to a cleanup associated with a nonoperating businesses, even though section 13305 does not require a showing that an owner caused or permitted the discharges that created the condition of pollution or nuisance. Furthermore, the State Board's decisions, on the whole, recognize the importance of at least awareness of that risk in imposing liability. On the other hand, the trial court's standard requires regional boards to make an excessively rigorous showing of knowledge before naming a prior owner in a cleanup order. The court directly incorporated the definition of "permitted" employed in the *Laube* decision, but that case concerned a very different context in which the public interest had to be balanced against the constitutional rights of licensees and where mandating vigilance on the part of licensees risked serious adverse effects on the public from a "severe surveillance regime." (*Laube*, *supra*, 2 Cal.App.4th at p. 379.)

UATC argues it cannot be said to have permitted waste to be discharged if it did not have knowledge of the discharge. But the term "permitted" is expansive enough to encompass a situation where a landlord let a discharge occur by allowing an activity to take place, where the landlord knew or should have known the general activity created a reasonable possibility of discharge.[28] Construing section 13304 to authorize regional boards to name such owners in cleanup orders elevates their interest in mitigating the risk

---

[28] At oral argument, UATC's counsel appeared to suggest that, if we rejected UATC's position, our test should reference a "reasonable probability" of discharge rather than a "reasonable possibility" of discharge. Counsel pointed out that section 13304, subdivision (e) defines "threaten" as a "condition creating a substantial *probability* of harm, when the probability and potential extent of harm make it reasonably necessary to take immediate action to prevent, reduce, or mitigate damages to persons, property, or natural resources." (Italics added.) However, that relates to a regional board's authority to impose a cleanup order as to a threatened discharge, not the meaning of "permitted." It is more consistent with the Legislature's goal of environmental protection to encourage caution by and impose responsibility on landowners who should know hazardous discharges are reasonably *possible*. (See *Respect Life South San Francisco v. City of South San Francisco* (2017) 15 Cal.App.5th 449, 456 ["reasonable possibility" standard in California Environmental Quality Act unusual circumstances exception].)

of discharges of hazardous wastes by lessees—and landowners are in a position to prevent such discharges. (See *Leslie Salt*, *supra*, 153 Cal.App.3d at p. 617 ["a narrow rendition of [appellant's] authority ascribes no significance to a landowner's ability to prevent the placement of fill on his land by others and, if adopted by the courts, would diminish the incentive for landowners to manage their properties so as to reduce the prospect of illegal fill, a result that is also clearly repugnant to the legislative purpose"].) Our construction of section 13304 also increases the likelihood that persons who profit from discharges (directly or indirectly) will bear the cleanup costs. Accordingly, our decision furthers the purposes of the Porter–Cologne Act, consistent with our obligation to liberally construe section 13304 to accomplish the legislative ends. (*Coastside Fishing Club*, *supra*, 158 Cal.App.4th at p. 1202.)[29]

We will remand and direct the trial court to conduct further proceedings consistent with this decision, which may include directing the Regional Board to apply section 13304 as construed herein and determination of the other remaining issues (see fn. 9, *ante*), as the court deems appropriate after hearing from the parties.

II.     *The Regional Board's Claim Was Not Discharged in UATC's Bankruptcy*

UATC contends in the alternative that, even if the Cleanup Order was authorized by section 13304, the Regional Board's right to impose the order is a claim that was released in UATC's Chapter 11 bankruptcy. (See *Johnson v. Home State Bank* (1991) 501 U.S. 78, 85, fn. 5 ["a discharge under the [Bankruptcy Code] extinguishes the debtor's personal liability on his creditor's claims"].) The 2001 bankruptcy confirmation order stated that "all Persons and Entities shall be precluded from asserting against the Debtors . . . any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred

---

[29] UATC argues, "UATC's lease of the Site ended in 1978, at a time when subsurface investigations were uncommon and the risk of groundwater contamination from PCE discharged from drycleaning operations was unknown, even among environmental regulators in California." That is a contested factual issue that the trial court left to the Regional Board to address in the first instance on remand; we do the same.

prior to the Effective Date." The Regional Board does not dispute UATC's allegation the effective date is March 2, 2001. The trial court rejected UATC's bankruptcy argument with little analysis, stating that "[a]n administrative order to clean up a hazardous waste site is not a 'claim' that is discharged in bankruptcy."

UATC's contention presents two separate issues. The first is whether the Regional Board's entitlement to a cleanup order is a "claim" within the meaning of the Bankruptcy Code. The second issue is whether the claim arose before the bankruptcy confirmation date, such that the Regional Board forfeited the claim by failing to file in the bankruptcy proceeding. We need not and do not address the first issue because we conclude UATC's argument fails under the second issue.[30] In particular, assuming that the cleanup order is a "claim," the claim did not arise before the bankruptcy confirmation date because it was not within the fair contemplation of the parties at that time.

"[T]he confirmation of a plan of reorganization 'discharges the debtor from any debt that arose before the date of such confirmation' ", so "the determination when a claim arises" is critical to determining if it has been discharged. (*In re Grossman's Inc.* (3d Cir. 2010) 607 F.3d 114, 122; see also *Flores v. Kmart Corp.* (2012) 202 Cal.App.4th 1316, 1327 ["Once a reorganization plan is confirmed, all of the debtor's debts that arose before the confirmation date are discharged."].)[31]

---

[30] The first issue presents a difficult question "at the intersection of bankruptcy law and environmental law." (*In re Chateaugay Corp.* (2d Cir. 1991) 944 F.2d 997, 999 (*Chateaugay*). Arguably, under *Ohio v. Kovacs* (1985) 469 U.S. 274 and its progeny, the Regional Board's Cleanup Order is a claim because it directs an entity no longer in possession of the subject property to clean-up hazardous waste deposited before the bankruptcy confirmation date. (See *In re CMC Heartland Partners* (7th Cir. 1992) 966 F.2d 1143, 1146 ["[t]o the extent [CERCLA] require[s] a person to pay money today because of acts before or during the reorganization proceedings, [the statute] creates a 'claim' in bankruptcy"].) However, not all the post-*Kovacs* decisions can be reconciled to that rule and it is unnecessary to resolve the issue to decide the present appeal.

[31] "[T]he determination when a claim arises has significant due process implications. If potential future tort claimants have not filed claims because they are unaware of their injuries, they might challenge the effectiveness of any purported notice of the claims bar

The Bankruptcy Code itself does not address when claims can be said to arise such that they are subject to discharge.  We follow the Ninth Circuit's decision in *In re Jensen* (9th Cir. 1993) 995 F.2d 925, 927 (*Jensen*), which thoughtfully considered the issue in order to "reconcile[]" the "conflicting objectives."  (*Id.* at p. 928.)  In particular, environmental cleanup laws "seek 'to protect public health and the environment by facilitating the cleanup of environmental contamination and imposing costs on the parties responsible for the pollution,' " while federal bankruptcy law "is 'designed to give a debtor a "fresh start" by discharging as many of its "debts" as possible.' "  (*Id.* at pp. 927–928.)

*Jensen* rejected the approach of courts that had concluded that "each element of a . . . claim must be established, including the incurrence of response costs, before a dischargeable claim arises."  (*Jensen*, *supra*, 995 F.2d at p. 928.)  *Jensen* reasoned that "[t]o hold that a claim for contribution arises only when there is an enforceable right to payment appears to ignore the breadth of the statutory definition of 'claim.' "  (*Id.* at p. 929; see also *Matter of Chicago, Milwaukee, St. Paul & Pac. R.* (7th Cir. 1992) 974 F.2d 775, 786 (*Chicago, Milwaukee*).)  *Jensen* also rejected the approach for which UATC advocates on appeal, in which "the bankruptcy claim arises at the time of the debtor's conduct relating to the contamination."  (*Jensen*, at p. 929.)  *Jensen* observed that " 'nothing in the legislative history or the Code suggests that Congress intended to discharge a creditor's rights before the creditor knew or should have known that its rights existed.' "  (*Id.* at p. 930; see also *Chicago, Milwaukee*, at p. 784.)

The *Jensen* court also rejected a "relationship" test articulated in *Chateaugay*, *supra*, 944 F.2d 997.  There, the debtor filed a schedule of liabilities with its Chapter 11

_____

date.  Discharge of such claims without providing adequate notice raises questions under the Fourteenth Amendment."  (*In re Grossman's Inc.*, *supra*, 607 F.3d at p. 122; see also *In re Savage Industries, Inc.* (1st Cir. 1994) 43 F.3d 714, 720–721; *In re Hexcel Corp.* (N.D. Cal. 1999) 239 B.R. 564, 566–572.)  We observe that UATC does not cite to any evidence it provided effective notice to the Regional Board regarding the 1991 bankruptcy proceeding.

bankruptcy petition including a list of "contingent" claims held by the EPA and state enforcement officers. (*Chateaugay*, at p. 999.) Although the EPA did not know which sites would require cleanup, it was thus provided an opportunity to file a proof of claim. (*Ibid.*) Because the EPA was "acutely aware" of the debtor, it was fair to treat all claims based on "pre-petition releases or threatened releases of hazardous substances" as dischargeable contingent claims. (*Id.* at p. 1005.) The court stated, "The relationship between environmental regulating agencies and those subject to regulation provides sufficient 'contemplation' of contingencies to bring most ultimately maturing payment obligations based on pre-petition conduct within the definition of 'claims.' " (*Ibid.*) The *Jensen* court rejected *Chateaugay's* " 'relationship' approach," because it "adopts 'so broad a definition of claim so as to encompass costs that could not "fairly" have been contemplated by the EPA or the debtor pre-petition.' " (*Jensen*, *supra*, 995 F.2d at p. 931, quoting *In re National Gypsum Co.* (Bankr. N.D.Tex.1992) 139 B.R. 397, 407 (*National Gypsum*).) As the bankruptcy court pointed out in *National Gypsum*, "[t]he only meaningful distinction that can be made regarding CERCLA claims in bankruptcy is one that distinguishes between costs associated with pre-petition conduct resulting in a release or threat of release that could have been 'fairly' contemplated by the parties; and those that could not have been 'fairly' contemplated by the parties." (*National Gypsum*, at pp. 407–408.)[32]

Instead of those tests or other variants, *Jensen* followed *National Gypsum* in adopting, at least in the context of environmental cleanup claims, "[w]hat might be called the 'fair contemplation' test [that] provides that 'all future response and natural resource damages cost[s] based on pre-petition conduct that can be fairly contemplated by the parties at the time of [d]ebtors' bankruptcy are claims under the [Bankruptcy] Code.' " (*Jensen*, *supra*, 995 F.2d at p. 930, quoting *National Gypsum*, *supra*, 139 B.R. at p. 409.)

_____

[32] Notably, UATC's argument regarding the date the Regional Board's claim arose lacks merit even under *Chateaugay*, because UATC fails to point to any evidence of a relationship between UATC and the Regional Board prior to bankruptcy comparable to the relationship between the EPA and the debtor in *Chateaugay*.

"[I]ndicia of fair contemplation" include knowledge of a site where a release occurred or was threatened to occur, " 'commencement of investigation and cleanup activities, and incurrence of response costs.' " (*Ibid.*)  The test is " 'not meant to encourage or permit dilatory tactics on the part of . . . any . . . relevant government agency.' " (*Ibid.*)

In *Jensen*, the debtors' lumber business filed a Chapter 11 bankruptcy petition in December 1983 and in January 1984 an inspector from a regional water quality control board visited the inactive lumberyard and "observed a fungicide dip tank." (*Jensen*, *supra*, 995 F.2d at p. 931.)  That board notified the debtors of the issue in February 1984, stating in a letter "that any release of the solution 'through accident or vandalism . . . . would probably cause a major fish kill in the South Fork Trinity River and could possibly affect the health of downstream water users.' " (*Id.* at p. 926.)  The debtors' attorney informed the regional board that the debtor's business was likely to go into Chapter 7 bankruptcy.  (*Ibid.*)  In March, the debtors filed a Chapter 7 personal bankruptcy petition and the lumber business' Chapter 11 proceeding was converted into a Chapter 7 liquidation.  (*Ibid.*)  That same month the regional board "brought the California DHS in to assist in removing the fungicide," and in May "a California DHS waste management specialist supervised the removal of the solution . . . [and] noticed spillage inside the building housing the tank, and evidence of leakage on the river side of the building.  He took soil samples, which revealed varying concentrations of PCP contamination . . . ." (*Id.* at pp. 926–927.)  The debtors' bankruptcy case was closed in 1985, apparently without any claim being filed by the State of California.  (*Id.* at p. 927.)  Eventually, the California DHS performed cleanup and sought a contribution from the debtors.  (*Ibid.*)  The debtors argued the claim was discharged in bankruptcy, and the Ninth Circuit agreed.  (*Id.* at pp. 927, 931.)  The court reasoned that the regional board's letter demonstrated it "knew of the serious environmental hazard that existed at the site." (*Id.* at p. 931.)  The court concluded the claim arose before the filing of the bankruptcy petition under the fair contemplation test, reasoning, "[the regional board] and California DHS are agencies of the same state, involved generally in many of the same capacities. . . .  We will impute the [the regional board's] knowledge to California DHS.  We conclude that the state had

45

sufficient knowledge of the Jensens' potential liability to give rise to a contingent claim for cleanup costs before the Jensens filed their personal bankruptcy petition on February 13, 1984. The claim filed by California DHS against the Jensens therefore was discharged in the Jensens' bankruptcy." (*Ibid.*)

*Jensen* described the fair contemplation test as "kindred" (*Jensen*, *supra*, 995 F.2d at p. 930) to the approach adopted by the Seventh Circuit in *Chicago, Milwaukee, supra*, 974 F.2d 775. There, the State of Washington knew of a spill of hazardous materials at a site formerly owned by the debtor in a bankruptcy reorganization and took soil samples and conducted tests concerning the possible contamination, but the state failed to file proof of its claim in the bankruptcy proceeding. (*Chicago, Milwaukee*, at p. 778.) The Seventh Circuit articulated the issue in the case as, "at what point does a party have a CERCLA claim for purposes of bankruptcy so that the failure to raise the claim before bankruptcy bar dates forever bars the claim from being brought against the successors to a reorganized company?" (*Chicago, Milwaukee*, at p. 779.) The court held that, "when a potential CERCLA claimant can tie the bankruptcy debtor to a known release of a hazardous substance which this potential claimant knows will lead to CERCLA response costs, and when this potential claimant has, in fact, conducted tests with regard to this contamination problem, then this potential claimant has, at least, a contingent CERCLA claim . . . ." (*Id.,* at p. 786; see also *id.*, at p. 787.)

We follow the approach of the *Jensen* and *Chicago, Milwaukee* courts regarding when a dischargeable claim can be said to arise. On that point we agree with the reasoning of the federal district court in *Signature Combs, Inc. v. United States* (W.D. Tenn. 2003) 253 F.Supp.2d 1028, 1038: "After reviewing the above theories, the Court finds the fair contemplation standard to be the appropriate standard to apply in the case at bar. It is the only test which tries to accommodate both the fresh start goal of bankruptcy and the speedy cleanup and polluter accountability CERCLA goals. Moreover, unlike other standards, the fair contemplation approach does not violate Fifth Amendment and Bankruptcy Code notice requirements because creditors must be aware of potential claims against debtors before such claims can be discharged." (See also *ibid.* ["Courts

46

and commentators have offered little criticism for the fair contemplation approach."];
*Flores v. Kmart Corp.*, *supra*, 202 Cal.App.4th at pp. 1327–1328 [describing various tests but declining to select among them].)

Under the fair contemplation test "a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law." (*In re SNTL Corp.* (9th Cir. 2009) 571 F.3d 826, 839.) UATC argues the Regional Board's claim arose before the bankruptcy proceeding because "the Regional Board fairly could have contemplated well before UATC's 2001 bankruptcy that it had a claim against the former owner of a property where a drycleaner had operated since the 1960s." The main thrust of UATC's argument on appeal is that if it can be held liable under section 13304 for permitting dry cleaning activities on its property simply because it knew of the activities (or knew or should have known of a reasonable risk of discharge from those activities), then the Regional Board's claim arose whenever it knew or should have known of those same activities (or the risk therefrom). UATC points out it was a matter of public record that UATC owned the Center for a lengthy period and that a dry cleaner operated there. It also argues the Regional Board knew by the 1980s of the risk of PCE discharges into groundwater. UATC asserts, "The Regional Board cannot have it both ways: it cannot assert that a movie theater company should have known that drycleaners always cause contamination, while simultaneously arguing that a state environmental agency could not have known the very same thing."

UATC's argument fails. The parties are not similarly situated: while it is reasonable to hold a landowner responsible for what it permits to take place on its property, it is not reasonable to expect the regional boards to track bankruptcy proceedings involving all landowners who have leased to dry cleaners (and every other business that might present a risk of hazardous waste discharges). Moreover, UATC's argument is based on a fundamental misconception that the "fair contemplation" test in the bankruptcy context must mirror the definition of "permitted" in section 13304 with respect to the knowledge required. The statutory schemes have different purposes that justify different standards. Although knowledge or constructive knowledge that its

47

lessees' dry-cleaning activities created a reasonable possibility of discharge would be sufficient to hold UATC liable under section 13304 for the reasons explained in Part I, such knowledge would not be enough to establish that the Regional Board should have contemplated it would have a cleanup claim at the Center, among the vast number of sites where dry cleaners have operated.

UATC cites no cases that find fair contemplation of the existence of a claim in circumstances anywhere close to those in the present case. Instead, in all the cases it cites, the claimant had specific reason to be on notice of the possibility of pollution by the debtor or at a specific site. As noted previously, in *Jensen*, the Water Board had been in communication with the debtors about the threat of discharge at the site prior to the filing of the bankruptcy petition. (*Jensen*, *supra*, 995 F.2d at p. 926.) In the *Chicago, Milwaukee* case, the State of Washington knew of a spill of hazardous materials at the site and had conducted tests concerning the possible contamination prior to the bar date for filing claims. (*Chicago, Milwaukee, supra*, 974 F.2d at pp. 777–778.) In another case involving the same railroad, a subsequent owner of the site was found to have "sufficient knowledge of its potential liability under CERCLA to require it to file a proof of claim." (*Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.* (7th Cir. 1993) 3 F.3d 200, 206.) Among other things, the railyard at issue was "included in a Superfund site," a report available to the subsequent owner "described contamination at the railyard," the owner's "own engineers had noted that the railyard might require extensive cleanup," and the owner "knew of EPA investigations in the area." (*Ibid.*; see also *In re Manville Forest Products Corp.* (2d Cir. 2000) 209 F.3d 125, 129 ["future environmental liability was actually or presumedly contemplated by the parties upon their signing of the indemnification agreements"]; *In re Cool Fuel, Inc.* (9th Cir. 2000) 210 F.3d 999, 1007 [State Board of Equalization's claim arose before bankruptcy where Board had knowledge of transactions that created tax liability and "the Board had contemplated a claim by initiating an investigation and issuing a deficiency determination for the disputed taxes"].)

Notably, UATC fails to discuss any of the specific factors identified in *Jensen* as appropriate to consider in applying the fair contemplation test. Those factors include: (1) " 'knowledge by the parties of a site in which' " there may be liability; (2) notification by the creditor to the debtor of potential liability; (3) " 'commencement of investigation and cleanup activities' "; and (4) " 'incurrence of response costs.' " (*Jensen*, *supra*, 995 F.2d at p. 930.) The only one of those factors that has any application here is the site knowledge factor, and only to the extent that the Regional Board could have determined that UATC leased to a dry cleaner at the site. The Regional Board did not have the type of knowledge present in the federal cases until approximately 2009, when Moonlite reported the existence of PCE in groundwater at the Center. The list of factors in *Jensen* is not exclusive, but UATC identifies no other considerations that suggest finding claim accrual pre-bankruptcy would be appropriate.

To find the claim arose in the present case before the 2001 confirmation of UATC's bankruptcy, we would have to conclude it is reasonable to expect the Regional Board to stay abreast of any bankruptcy filings by any entity or individual that owned or owns any site where a dry cleaner is operating or has operated. By analogy, we would also necessarily be concluding that the Regional Board is required to stay abreast of any bankruptcy filings by any entity or individual that owns or owned any site where any number of other businesses that carry a risk of waste discharges operate or operated. Although it is appropriate to conclude the Regional Board can reasonably contemplate the existence of a claim and be expected to participate in a bankruptcy proceeding where the Regional Board has information regarding the likelihood of a discharge at a specific site, it would render the test meaningless to apply it as broadly as UATC suggests. Indeed, if the test were as broad as UATC suggests, the courts in the *Jensen* and *Chicago, Milwaukee* cases would not have needed to discuss the evidence showing actual or constructive notice, because the risk of pollution at railroad and lumber yards is something the claimants in those cases should have been aware of.

49

In conclusion, UATC has presented no facts showing that the Regional Board's claim arose before the 2001 bankruptcy confirmation; accordingly, the claim was not discharged in the bankruptcy proceeding.[33]

## DISPOSITION

The trial court's order is reversed. The matter is remanded for further proceedings consistent with this decision. Costs on appeal are awarded to the Regional Board.

---

[33] Remand for further proceedings on this issue is not appropriate. UATC had an opportunity to present evidence below on the issue of when the claim arose and to discuss that evidence in its briefs on appeal, and its showing fails as a matter of law.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

(A152988)

Superior Court of Alameda County, No. RG16811955, Hon. Jennifer Madden, Judge.

Hogan Lovells US, Scott H. Reisch, Katherine B. Wellington, for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Gavin G. McCabe, Mark W. Poole and Marc N. Melnick, Deputy Attorneys General, for Defendant and Appellant.